Submitted on briefs February 16; affirmed March 21, 1944

# PENN *v.* HENDERSON
## (146 P. (2d) 760)

[ 1 ]

Before BAILEY, Chief Justice, and BELT, ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Marks & McMahan* and *Weatherford & Thompson,* all of Albany, for appellant.

*Carson & Carson,* of Salem, and *Victor Olliver,* of Albany, for respondent.

BRAND, J.

This is an action for assault and battery. There was a verdict and judgment for the defendant and the plaintiff appeals. The complaint alleges that the defendant maliciously broke the plaintiff's jaw by striking it with his fist, thereby causing serious and permanent injuries and certain special damages. The defendant in his answer admits that he struck the plaintiff, but denies the alleged resulting injuries and damage.

As a first, separate defense, the defendant alleges that he was the owner and in lawful possession of a restaurant; that the plaintiff entered the same and conducted himself in a disorderly manner, obstructing the peaceable operation of the defendant's business and place; that defendant requested the plaintiff to pay certain indebtedness owing by the plaintiff to the defendant and to depart; that the plaintiff did not depart within a reasonable time and that the defendant, using only such force as was reasonably necessary, attempted to remove the plaintiff from the restaurant; that plaintiff resisted and assaulted the defendant and invited the defendant to engage in mutual combat and the defendant did, without excessive force and without intent to do serious material injury, so engage in

mutual combat, having been provoked by the plaintiff so to do.

As a second, affirmative defense, the defendant reiterates his first defense and in substance pleads that he acted in self-defense. Defendant alleges that he had been previously informed and believed, and then had in mind, that the plaintiff on a former occasion had threatened to do bodily harm to another person with a knife and that the defendant reasonably believed that the plaintiff intended and had the means and ability and was then preparing to attack the defendant with a knife and that the defendant engaged in said altercation reasonably believing that he was acting in self-defense to prevent great bodily harm to himself.

As a third defense, the defendant reiterates the allegations of his first defense and alleges that he acted in defense of his property as against trespass by the plaintiff. The plaintiff's reply admits the defendant's ownership and operation of the restaurant and denies all of the remaining allegations of the affirmative defenses.

■ BRAND, J. The evidence is conflicting. According to the testimony of the plaintiff which the jury were at liberty to believe, but did not, the defendant, without any legal justification, struck the plaintiff in the jaw and thereby became guilty of assault and battery. The striking of at least one blow is admitted by the defendant and there is ample evidence that the blow caused substantial injury to the plaintiff. It therefore became the duty of the court to instruct the jury on the plaintiff's theory of the case. This the court did. It properly defined assault and battery and stated that if the defendant beat the plaintiff, the defendant would

be "liable in this case unless the defendant has justified his conduct by proving by a preponderance of the evidence one or more of the defenses alleged in his answers."

We have examined all of the testimony in the case, but it is not necessary to review it at length. The only matters presented upon this appeal relate to the giving or the refusal to give certain instructions to the jury. We shall therefore summarize the testimony only to such extent as may be necessary to place the instructions given or requested but not given, in their proper evidentiary setting.

As we have said, aside from the questions which arise from the affirmative defenses, the general law supporting plaintiff's theory of the case was adequately presented to the jury. Concerning the affirmative defenses, there is evidence tending to show the following facts.

The plaintiff's general reputation in the community as a peaceful and law-abiding citizen was bad. He was frequently drunk and when drunk, was disorderly. He had previously been convicted of forgery. The plaintiff himself testified as follows:

"Q Would you say you haven't been in difficulty for drinking and disorderly conduct around Albany at least eleven times?

"A I wouldn't say how many; I wouldn't say whether it was 11 or 13.

"Q If I gave you the number 11, would that shock you—would that surprise you?

"A No, it wouldn't.

"Q And in each instance you never questioned but what you had been drunk and disorderly.

"A No question about it.

"Q You had been?
"A Yes, sir."

The defendant had known the plaintiff for several years, had seen him quite frequently and knew his disposition. The plaintiff had previously come to the defendant's restaurant when under the influence of intoxicating liquor and had conducted himself, to the defendant's personal knowledge, in a boisterous, noisy and insulting manner. The defendant had asked the plaintiff to stay away, but the plaintiff had nevertheless entered the defendant's place of business on several occasions. The defendant testified:

"Q And the times he was there, what had been his condition and conduct?

"A Just that every time he was under the influence of liquor, but at times he was worse and a couple of times before this incident he would stand at the end of the counter and get in the girls' way, and they would have to come and ask me to have him sit down. He wouldn't mind the girl; he would stand at the end of the counter and stare at her. One particular night he was with a particular taxi driver and they were both drunk and boisterous and I asked him to leave. I had known the other fellow a long time too, and I finally persuaded them to leave."

The defendant had been informed of a previous occasion on which the plaintiff had made threats to stab a man in the abdomen with a knife and, in order to avoid trouble, had attempted to stay away from the plaintiff whenever the plaintiff came to the restaurant.

On the occasion of the altercation with which we are concerned, the defendant was working in the kitchen and heard the plaintiff enter before he saw him. Plaintiff greeted everyone in a boisterous voice. Before

coming to defendant's place, plaintiff had consumed two "stubbies" of beer. After the waitress had requested two or three times, the plaintiff sat down and "* * * after he sat down he wouldn't give her his order, and she came back to the kitchen and said she served Mrs. Ward a bottle of beer, but she couldn't get his order; he sat there staring at her, and she finally went back and he ordered his beer. * * *" While in the restaurant he drank two more bottles of beer. When the plaintiff and his female companion were leaving, the defendant observed that an argument had arisen and he therefore went to the front of the restaurant, but inside of the horseshoe-shaped counter. The plaintiff was exhibiting a roll of bills and saying that he was going to spend all of that money before he went to the army so the defendant asked him to pay an old bill which plaintiff had owed for several years to which the plaintiff answered that he would pay it when he got "damn good and ready." The debt of which the defendant asked payment arose from an earlier purchase by the plaintiff of a meal ticket on credit. The defendant testified as follows:

"A I said, 'You've owed this bill about four years, Harold, I think you should pay it,' and he said, 'If you think you're so damn tough, why don't you take it out of my hide?'

"Q What happened then?

"A I walked out and around the counter, and I asked him if he was going to pay the bill and leave the place, I didn't want his business, and he said 'No'."

 * * * * *

"A After he refused to pay me, I asked him to get out and stay out, and I reached for the door with my right hand, and reached for his necktie with my

left hand, and when I reached for the door, well, he shoved me with his right hand against the shoulder and struck his left hand down his side, and it came to me in a moment there about what this fellow said about him carrying a knife in the depot cafe, and I turned the door loose and struck him.

"Q How many blows did you strike him?

"A I think two; I am not positive.

"Q In striking him, what was your idea?

"A It was defending myself more than anything else. I didn't have no intention of injuring him. I just did it to defend myself. I wanted him to leave, and he wouldn't leave, and I didn't want to get knifed myself, or cut.

"Q Did he strike the floor?

"A Yes, he did; he staggered back from where we were standing, about four steps, and fell against the wall and the stove, a large gas heater.

"Q Did he get up?

"A Yes, he did, he got up.

"Q What did he do?

"A He got up and kind of brushed his coat and stood and looked at me, and I said, 'Harold, are you going to pay this bill or not?' and he said yes, he would pay it.

"Q Did he pay it?

"A No, while I was writing out the receipt, when I had my side to him and was writing out the receipt, he said, 'I don't think I will pay this bill, I don't have to pay this bill,' so I turned around to him and said, 'Well, get out then,' and he cussed me and called me a bastard, not in those exact words, and I struck him again.

"Q But he wouldn't leave at any time?

"A No.

"Q How many times did you tell him to get out?

"A Three or four times."

The plaintiff then paid the bill for the meal ticket, the defendant gave him a receipt, plaintiff "stuck his hands out and wanted to shake hands," the defendant shook hands with him and the plaintiff left.

The foregoing was a fair summary of the evidence upon which the defendant relies for the support of his affirmative defenses and it is in view of this background that we must determine the propriety of the instructions requested or given.

Before considering the law relative to the issues presented, we will once more direct attention to the rules of this court. Rule 13, Paragraph 1, is as follows:

"1. INDEX. At the beginning the appellant's brief shall contain an index of all assignments of error. Any brief more than 20 pages in length shall contain an additional subject index with page references, to be supplemented by a list of all cases referred to in the brief, alphabetically arranged, together with notation of pages in the brief where such cases are cited."

This rule was not observed. Of greater importance is Paragraph 3 of the same rule which provides in part:

"3. ASSIGNMENTS OF ERROR OR PROPOSITIONS OF LAW INVOLVED. Each assignment of error or proposition of law must be separately stated under an appropriate heading. Each such assignment or proposition should be clearly and succinctly stated. Assignments of error presenting the same legal question are to be avoided.

"The following arrangement and wording, as far as applicable, together with reference to page of Bill of Exceptions, are required:

"The court erred in failing to give the following requested instruction: (Set out instruction haec verba), or

"The court erred in giving the following instruction: (Set out instruction and objection made thereto, both haec verba), * * *"

The meaning of the rule as applied to this case is clear. Each instruction requested by appellant but not given, if assigned as error, should be set forth verbatim and in full in the brief, separately stated and with appropriate heading. When error is assigned by reason of the giving of an instruction, it should also be set forth verbatim, followed by the objection made thereto, also verbatim. Compliance with this rule is of practical importance in the administration of justice by this court. The instant case is employed to illustrate that importance. Any comment on the defects in the appellant's brief is not intended as criticism of eminent and experienced counsel, but is made because of the practice of ignoring the rules of the court which has become prevalent among the members of the bar and which practice must cease.

Under the heading "Assignments of Error", we find four paragraphs each of which, with the exception of number and paragraph, is substantially as follows:

"That the Court erred in refusing to give plaintiff's requested instruction No. 1, set forth in the Bill of Exceptions, exception No. 1 on page 1;"

We also find nine separate assignments of error which similarly set forth merely that the court erred in giving an instruction which is identified only by reference to the Bill of Exceptions. There is a complete absence in all nine assignments of any specification, verbatim or otherwise, of the objection which was made at the trial to the instruction as given. Reference to the Bill of Exceptions does set forth the instructions given and

the verbatim objections made, but that does not comply with the rule of the court. We have had recent instances (though not in this case) in which even an examination of the Bill of Exceptions would fail to disclose what, if any, objection was made to the instructions given or where in the voluminous transcript such objections might be found. There are seven judges in this court and members of the bar as well as of this court earnestly desire that deliberation and decision be participated in by all of the judges who sit on the case. Each judge has a copy of the printed brief, but there is only one transcript and one Bill of Exceptions. With the exception of the judge who is assigned to write the opinion, the members of the court have in their possession only the briefs. In the case at bar, for example, a complete study of appellant's brief would leave them without any knowledge of the specific issues raised by the thirteen assignments of error. They may, of course, after the opinion is written, in turn borrow the transcript and in undue time advise themselves of the true issues. But the undoubted evil incident to the law's delay should not be unnecessarily aggravated by a procedure which can be avoided by following the simple rules of this court. Those rules are fully set forth in 9 O. C. L. A., page 317 et seq., and in Volume 170 of the Oregon Reports. Rules 11 and 2 provide in part:

"* * * In no case will these rules, or any of them, be waived, suspended or modified upon agreement of counsel only." Rule 11, § 1.

"No alleged error of the circuit court will be considered by this court unless regularly presented in the assignments of error contained in the appellant's opening brief, except that this court reserves the right to take notice of an error of law apparent on the face of the record. * * *" Rule 2.

■ Future appellants will have no right to assume that errors in the record will be noticed by this court unless they are *regularly* presented in the assignments of error as required by the rules. If other errors are noticed, it will only be by virtue of the exercise by this court of its discretion in order to prevent a miscarriage of justice.

■ We will briefly consider the principles of law which are controlling in this case. The plaintiff testified in substance that the defendant, without provocation or justification, struck him with his fist. He thereby made out a *prima facie* case of assault and battery.

■ ■ The only serious questions relate to the asserted affirmative defenses. The defendant claims that the plaintiff provoked the altercation and challenged the defendant to engage in mutual combat, but provocation by mere words, if unaccompanied by any overt act of hostility, will not justify an assault. *Silfast v. Matheny,* 171 Or. 1, 136 P. (2d) 260, 6 C. J. S. 807, § 17. Nor can the defendant successfully contend that the alleged invitation to mutual combat constitutes a defense. The only challenge which is supported by any evidence was not sufficient alone to justify the defendant's admitted action. 6 C. J. S. 806, § 16 (2).

The first four assignments of error are based upon the refusal of the court to give certain instructions requested by the plaintiff, each of which deals with the law relative to the rights and liabilities of an "aggressor." The next five assignments of error are based on exceptions taken by the plaintiff to instructions given by the court and in each instance, the exception taken at the time of trial was in substance similar to that stated under exception No. 5 which was in part as fol-

lows: Exception was taken "* * * for the further reason that it is erroneous because it does not qualify whether or not the defendant was the aggressor; in other words, the defendant may have been the aggressor under this instruction and brought on the controversy. We except to it for that reason."

 The first assignment of error is clearly without merit. The requested instruction stated, among other things, that there was no evidence in support of either the first, or the second separate defense. Under the evidence it was for the jury to determine whether defendant was justified in his attempt to eject the plaintiff or in striking the plaintiff in self-defense. The instruction was properly refused.

 We think that the court sufficiently covered the requested instructioins set forth in exceptions Nos. 2, 3, and 4, in the following words:

"If the defendant left his position by the cash register inside the horseshoe counter and walked around to where Penn was with the intent and purpose of assaulting and beating the plaintiff Penn and not with the intention only of removing Penn from his place of business, and it appeared to Penn that the purpose of his coming around and approaching him was to assault and beat him and that he had the apparent present ability to carry this purpose into effect, and Penn as a reasonable man believed that Henderson's sole purpose was to strike and beat him, then Henderson would not have the right of self-defense or the defense of his property unless he abandoned his original purpose and indicated such abandonment to Penn."

While the instruction is not a model of accuracy, it was sufficiently favorable to the plaintiff. By this and other instructions the court clearly indicated to the

jury that if the defendant struck the plaintiff without justification, he would be liable, which is the same as telling them that the defendant would be liable if he as aggressor assaulted the plaintiff, and in the instruction last quoted it is made clear that if defendant was acting as an aggressor, and not in defense of his property or person, he would be deprived of the right of self-defense or of the defense of property, unless he abandoned his original purpose and indicated such abandonment to the plaintiff. It is true, as argued by the plaintiff, that if the defendant was the aggressor he could not justify on the ground of self-defense unless he in good faith first withdrew from such aggression. 6 C. J. S. 814, § 18 (5).

In an ordinary case, the one who is deemed the aggressor under this rule is the one who first employs hostile force against the other and such a one may not, while his aggression continues, claim the right of self-defense, but a lawful owner or occupant of a place of business such as a restaurant may use such force as may be reasonably necessary to remove a person who was originally on the premises by permission, but who refuses within a reasonable time to leave after being requested by the owner so to do. 1 Restatement of Torts, § 77; *Brookside-Pratt Mining Company v. Booth,* 211 Ala. 268, 100 S. 240, 33 A. L. R 417; 6 C. J. S. 819.

The implied license or invitation to enter a store or restaurant may be revoked at any time as to any individual. 4 Am. Jur. 167. It is doubly true that a proprietor may employ such force as is and appears reasonably necessary to eject a disorderly person who refuses to leave on request. *Crouch v. Ringer,* 110 Wash. 612, 188 P. 782, 9 A. L. R. 374; *Gargotto v. Isen-*

*berg,* 244 Ky. 493, 51 S. W. (2d) 443; *Shramek v. Walker,* 152 S. C. 88, 149 S. E. 331; *Tipsword v. Potter,* 31 Idaho, 509, 174 P. 133, 6 A. L. R. 527.

 Thus it appears that under such circumstances the person first exerting hostile force against the other would not be an aggressor under the meaning of the rule above cited. It was this consideration which no doubt influenced the trial court to refuse the requested instructions concerning aggressors. There was substantial evidence that the plaintiff was conducting himself in an offensive and disorderly manner. If such was the fact, the defendant was justified in employing such force as appeared to him, as a reasonable man, to be reasonably necessary. If excessive force was employed, the defendant would be liable, but whether or not the force employed was excessive under the circumstances, was a question of fact for the jury.

 The defendant does not contend that his initial force was employed in self-defense, but rather that it was employed in a reasonable attempt to eject the plaintiff. It was only after the defendant had exerted force in an attempt (as he says) to eject the plaintiff that the question of self-defense arises. There was evidence from which the jury could find that the defendant knew of threats previously made by the plaintiff to use a knife and that the plaintiff made an overt act, reasonably causing the defendant to apprehend that the plaintiff was about to draw a knife against him. If the jury so found and found further that the defendant struck the plaintiff, using no more force than was reasonably necessary in self-defense, the defendant would not be liable.

The cases cited by the plaintiff in support of his contention that the defendant was the aggressor are

not in point under the facts of this case. *Stockham v. Malcolm,* 111 Md. 615, 74 A. 569, 19 Ann. Cas. 761, did not involve the right of a proprietor to eject a recalcitrant guest. *Robertson v. Sisk,* 115 Ark. 461, 171 S. W. 880, involved neither the right of defense of property nor of self. The opinion of the court makes it clear that no right of self-defense was involved in the case.

*Johanson v. Huntsman,* 60 Utah 402, 209 P. 197 (1922), did involve the right of a proprietor to eject a guest from the premises, but the facts are entirely different from those of the case at bar. In that case the defendant refused to accept delivery and pay for a C. O. D. package which the plaintiff brought to defendant's store. Defendant ordered plaintiff out of the store, to which the plaintiff replied, ''I am pleased to go as soon as I get my dollar.'' Whereupon the defendant took a wagon felly, consisting of a piece of wood weighing about six pounds, and struck the plaintiff on the left side of the head causing serious injury. The court held that the defendant's conduct amounted to assault and battery as a matter of law and said, ''None of the authorities cited by appellant justifies the violent use of a dangerous weapon, such as was used by defendant in the case at bar merely to eject a person from his premises, though such person be a trespasser at the time of the assault.'' In the Johanson case it was the defendant who employed a dangerous weapon. In the case at bar, it was the plaintiff who appeared about to do so.

*Howell v. Winters,* 58 Wash. 436, 108 P. 1077, recognizes the right of a proprietor to eject a person if only reasonable force is employed for that purpose. It is not inconsistent with our conclusion here.

█ Exception No. 4 is based upon the refusal of an instruction concerning the purported right of the plaintiff to use a knife in the event that the defendant was the aggressor and had the apparent ability to strike the plaintiff with his fists in such manner as to cause grievous bodily harm. It is true that serious injury did in fact result to the plaintiff from the blow struck by the defendant, but there is also evidence that the defendant could not have reasonably anticipated that consequence. We think there is no view of the evidence in the case which would have justified the plaintiff in employing a knife against the defendant. The request was properly refused.

█ We have carefully examined the court's instructions which are challenged by exceptions Nos. 5 to 9, inclusive, and are of the opinion that they are not vulnerable to the objections urged by the plaintiff in his Bill of Exceptions. The defendant contends that in one instruction the court improperly treated mutual combat as a defense. We do not so construe the instruction. It was to the effect that "if you find * * * that while defendant was attempting * * * to remove the plaintiff * * * the plaintiff resisted the defendant and that thereupon the defendant without using excessive or disproportionate force, and without intent on the part of the defendant to do serious or material injury to the plaintiff, did engage in mutual combat with plaintiff * * * the defendant was justified * * *." The court did not imply that invitation to, or engaging in, mutual combat alone would

justify the defendant's action, but only that combat in the reasonable exercise of his right to eject the plaintiff would be justifed.

██ ██ We have examined the instructions to which exceptions Nos. 6, 7, 8, and 9 were taken. When read with the other instructions, as they must be, we find no error. The court did not in each separate instance repeat that only reasonable force could be employed in ejecting the plaintiff or in self-defense, but that was repeatedly stated and we think the jury could not have been misled.

██ By exceptions Nos. 10 and 12 critcism is directed at certain instructions concerning damages which in effect advised the jury that provocative words and acts might be considered in mitigation of damage. In this case the plaintiff asked only for compensatory damages. It follows that it was error for the court to instruct the jury that they might consider provocation in mitigation of damage.

"Provocation given the defendant by plaintiff leading to an assault and battery can mitigate only punitive damages, not those compensatory in their nature." *Housman v. Peterson,* 76 Or. 556, 149 P. 538.

By another instruction on damages the court advised the jury in substance that the defendant would not be liable for such damage as was caused by plaintiff's own negligence, if any, in failing to take such steps as a reasonably prudent person would take for the care and repair of his injury. We have grave doubts as to whether there was evidence of any negligent failure by the plaintiff to care for his injury sufficient to justify this instruction; however, we are of the

opinion that no error prejudicial to the plaintiff's rights was committed. The question of the defendant's liability was fairly submitted and the jury by its verdict found the defendant not liable. Instructions concerning the measure of damages thus became immaterial.

The judgment is affirmed.