No. 399 May 13, 2026 419

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

ANTHONY ALAN WORSHAM,
*Defendant-Appellant.*

Douglas County Circuit Court
21CR46056; A178554

On remand from the Oregon Supreme Court, *State v. Worsham*, 374 Or 781, 593 P3d 1042 (2026).

Ann Marie Simmons, Judge.

Submitted on remand March 31, 2026.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stacy M. Du Clos, Deputy Public Defender, Oregon Public Defense Commission, for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patricia G. Rincon, Assistant Attorney General, for respondent.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

This case is on remand from the Supreme Court. Defendant was charged with first-degree assault and unlawful use of a weapon, based on an incident in which he stabbed C in the chest with a pocketknife during an encounter at night in a park. Defendant claimed self-defense, and, at trial, the state sought to defeat that defense by proving that defendant was the initial aggressor. *See* ORS 161.215(1)(b) ("[A] person is not justified in using physical force upon another person if * * * [t]he person is the initial aggressor[.]"). The jury ultimately found defendant guilty of second-degree assault (as a lesser included offense) and unlawful use of a weapon, thus necessarily rejecting self-defense. On appeal, defendant has raised two assignments of error: (1) that the trial court erred in not instructing the jury on what it means to be an "initial aggressor"; and (2) that the trial court erred in "allowing the state to urge the jury to reject defendant's self-defense claim on an improper basis." Neither claim of error was preserved in the trial court, so defendant requests plain-error review.

We addressed the first assignment of error in *State v. Worsham*, 332 Or App 154, 548 P3d 849 (2024), *rev'd*, 373 Or 739, 571 P3d 759 (2025), *modified on recons*, 374 Or 781, 583 P3d 1042 (2026) (*Worsham I*). There, we held that the trial court plainly erred in failing to define "initial aggressor" for the jury. *Id*. at 164-65. The Supreme Court disagreed and reversed our decision, holding that it was not plain error not to instruct the jury on the meaning of "initial aggressor" when no one had requested that instruction. *State v. Worsham*, 373 Or 739, 741, 571 P3d 759 (2025), *modified on recons*, 374 Or 781, 583 P3d 1042 (2026) (*Worsham II*). The court remanded for us to address defendant's second assignment of error. *Worsham II*, 374 Or at 782. We did not reach that assignment in our original opinion. *Worsham I*, 332 Or App at 156 n 2 ("Given our disposition, we do not discuss defendant's second assignment of error.").

Whereas defendant's first assignment of error focused on how the court instructed the jury on self-defense and its limitations, defendant's second assignment of error challenges how the prosecutor argued the initial-aggressor

limitation to the jury. Defendant contends that the prosecutor's improper closing argument deprived him of a fair trial. As explained below, we conclude that the prosecutor's closing argument was obviously improper, in that it misled the jury as to what it means to be an initial aggressor, but that the error would have been curable by properly instructing the jury on that issue and thus ensuring defendant a fair trial. It follows that defendant's plain-error claim fails. We therefore affirm.

FACTS

On August 31, 2021, defendant was living in a tent in a park in Roseburg. The complainant, C, and his girlfriend, B, were living in a parked vehicle in the area. C and B had been arguing loudly for days. Around midnight, B left the vehicle and walked to the park to purchase drugs, and C, who had used methamphetamine that evening, followed her and caught up with her. What exactly happened from there was the subject of conflicting evidence at trial. C may or may not have pushed B to the ground. C may or may not have slapped B. B may or may not have called for help. In any event, defendant decided to get involved. Holding his open pocketknife at his side, defendant left his tent and walked toward C and B's perceived location.

Defendant and C encountered each other in the darkness, about 10 to 20 feet from where B lay on the ground, and a physical altercation ensued. Defendant and C gave conflicting accounts of the altercation. According to defendant, he had yelled out as he approached not to beat on women, and, when C came out of the darkness, C swung at defendant at least four times, making contact once, then charged at defendant's waist as if to wrestle him to the ground. Defendant braced himself, and, in the charge, C impaled himself on the knife that defendant was carrying for self-defense, although neither man realized it immediately in the dark. C backed up and kicked defendant in the ribs, only then realizing that he had been stabbed and was bleeding. According to C, he was leaving to walk back to his vehicle when defendant came out of nowhere, punched him in the chest, and said "we have history" and to "stop beating on women." C and defendant circled each other, and C tried

to kick defendant but missed, and then C looked down and saw that he had been stabbed. The only eyewitness to the actual altercation, D, who was wearing a headlamp, did not see who started it but heard C and defendant arguing and saw the end of the altercation.

Defendant returned to his tent and called 9-1-1. Defendant told the 9-1-1 operator that someone had run into his knife while attacking him. In an interview at the hospital, C told the police that the fight was prompted by defendant saying something like "you shouldn't hit a woman." Defendant was interviewed at the police station over a nine-hour period; he maintained that he never intended to stab C, that he carried the knife only for protection, and that C had impaled himself while trying to assault defendant.

Defendant was charged with first-degree assault, ORS 163.185, and unlawful use of a weapon, ORS 166.220. Before trial, he gave notice that he claimed self-defense, thus triggering the state's burden to disprove self-defense. At trial, the state sought to disprove self-defense by, among other things, proving that defendant was the initial aggressor. (The state also made arguments about provocation and mutual combat.)

After both parties rested, the court instructed the jury. It gave instructions on the elements of assault, the defense of self-defense, and limitations on self-defense, including the following instruction on the "initial aggressor" limitation:

> "*Ordinarily a person is not justified in using physical force on another person if he was the initial aggressor.* However, the Defendant's use of physical force may be justified even when he was the aggressor if you find that he withdrew from the encounter and effectively communicated to the other person an intent to withdraw from the encounter but the other person nevertheless continued or threatened to continue the use of unlawful physical force upon the Defendant."

(Emphasis added.) The court did not instruct the jury on what "initial aggressor" means.

The parties then gave closing arguments. Regarding the initial-aggressor limitation on self-defense, the prosecutor argued that being the initial aggressor did not necessarily require physical aggression and that it was for the jury to decide what "aggressor" means:

> "Well, then you have to look who is the initial aggressor. And it doesn't have to be one or the other but who is the initial aggressor in this, right? And look in here. It doesn't say physically aggressive. It's aggressor. It's open. It's open to your determination.
>
> "A person is not justified in using physical force on another person if he was the initial aggressor. What did [the complainant] say to [defendant]? What did [the complainant] know about [defendant] at that moment? Nothing. He had no idea he was even there."

A moment later, while transitioning into the separate issue of deadly force, the prosecutor reiterated his broad view of what an "initial aggressor" is, stating, "Then we move to limitations on the use of deadly physical force. Let's say you get there and you say oh, no. [Defendant], he wasn't the initial aggressor. He didn't provoke anything. He's just minding his own business and look what happens, right."

Defense counsel did not address the prosecutor's characterization of the law in the defense closing. He argued only that, under defendant's version of events, defendant was not the initial aggressor.

The prosecutor focused his rebuttal closing argument on the limitations on self-defense. He argued that, although "[t]here are situations where you could walk up to something [*sic*] and say something in a certain manner and it might not be provocation or you may not be the initial aggressor," here, "you're walking up to someone yelling in their face to stop beating on women." The prosecutor continued, "[I]n this situation one thing is gonna happen. And everyone in this courtroom knows it, including [defendant]. But he did that. He walked into that. He created the situation. He was the one in control." The prosecutor continued on the control theme, then concluded, "He has a duty, injecting himself, not to provoke or be the initial aggressor which he

clearly does. That removes his ability for self-defense." The prosecutor asked the jury to find defendant guilty.

The jury found defendant guilty of second-degree assault, as a lesser included offense of first-degree assault, and unlawful use of a weapon. The two verdicts merged into a single conviction for second-degree assault.

## ANALYSIS

In his second assignment of error, defendant argues that the prosecutor's closing argument deprived him of a fair trial. He contends that the prosecutor "misstated the standard for the initial aggressor limitation by arguing that [the state] did not have to prove that defendant was physically aggressive and suggested that defendant was the initial aggressor merely by 'injecting' himself into a volatile situation." Defendant notes that "[t]his was a close case on whether defendant's conduct was justified by self-defense" and argues that "the prosecutor invited the jury to decide that central issue on an improper basis, without requiring the state to meet its burden of proof on the limitations of self-defense."

The state responds that the prosecutor's statements were not obviously improper and that, even if they were, they were not so prejudicial as to deny defendant a fair trial. The state notes that defendant had an opportunity to address the prosecutor's statements in his own closing argument.

We begin with the standard of review. "Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). We have discretion, however, to correct a "plain" error. ORAP 5.45(1); *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013) (stating requirements for an error to be "plain"). For a prosecutor's statements in closing argument to rise to the level of plain error, it must be "beyond dispute" that they "were so prejudicial as to have denied defendant a fair trial." *State v. Chitwood*, 370 Or 305, 312, 518 P3d 903 (2022) (internal quotation marks omitted). To meet that standard, the statements, individually or collectively, must have been both obviously improper *and* incurable. *State v. Perez*, 373 Or 591, 606, 568 P3d 940 (2025).

The first question, then, is whether the prosecutor's statements were obviously improper. They were. "Initial aggressor" is a legal term of art. *State v. Phillips*, 313 Or App 1, 5, 493 P3d 548, *rev den*, 368 Or 788 (2021) ("The term 'aggressor' has long been a legal term of art used with the criminal defense of self-defense."). It is well-established that "provocation by mere words, if unaccompanied by any overt act of hostility," does not make a person the initial aggressor, as that term is used for the limitation on self-defense. *Penn v. Henderson*, 174 Or 1, 14, 146 P2d 760 (1944); *see also Phillips*, 313 Or App at 6 (same). Overt acts of hostility may include, for example, slapping or striking a person, *Silfast v. Matheny*, 171 Or 1, 10, 136 P2d 260 (1943), or spitting in a person's face, *Phillips*, 313 Or App at 7. In common and modern usage, by contrast, "aggression" may be understood to encompass not only physical aggression but verbal aggression. *See Worsham I*, 332 Or App at 160 (discussing same and citing dictionaries and other sources).

The prosecutor's statements in closing argument were legally incorrect and decidedly misleading as to what it means to be the initial aggressor in an altercation giving rise to assault charges. In his principal closing, the prosecutor pointed to the jury instructions on self-defense and argued, "It doesn't say physically aggressive. It's aggressor. It's open. It's open to your determination." That statement was misleading both as to physical aggression not being required and as to there being no legal standard for what it means to be the initial "aggressor" for self-defense purposes. Then, soon thereafter, while transitioning into the separate issue of deadly force, the prosecutor strongly suggested that the jury could find defendant to be the initial aggressor merely by virtue of his injecting himself into the situation between C and B. He described the scenario of the jury deciding that defendant was not the initial aggressor and proceeding to the issue of deadly force as follows: "Let's say you get there and you say oh, no. [Defendant], he wasn't the initial aggressor. He didn't provoke anything. He's just minding his own business and look what happens, right." It is absolutely incorrect under Oregon law that failing to mind one's own business makes one the initial aggressor.

In rebuttal closing, the prosecutor doubled down. He argued that, although "[t]here are situations where you could walk up to something [*sic*] and say something in a certain manner and it might not be provocation or you may not be the initial aggressor," here defendant walked up "yelling in [C's] face [to] stop beating on women." The prosecutor continued, "In this, in this situation one thing is gonna happen. And everyone in this courtroom knows it, including [defendant]. But he did that. He walked into that. He created the situation. He was the one in control." The prosecutor continued on the theme of control, then concluded, "He has a duty, injecting himself, not to provoke or be the initial aggressor which he clearly does. That removes his ability for self-defense." Those statements were legally incorrect and misleading. Walking up to a potential domestic-violence situation and saying not to beat on women may be dangerous, because it is obviously possible that the violence will be turned toward you, but it does not make one the initial aggressor for self-defense purposes. The prosecutor's continued focus on defendant injecting himself into C and B's situation, yelling at C not to beat on women, and "provoking" C,[1] such that "everyone" knows that "one thing is gonna happen," was highly misleading as to what it means to be the initial aggressor for self-defense purposes. They were also the last words the jury heard on the initial-aggressor issue. *See Chitwood*, 370 Or at 318 (improper statements in rebuttal closing argument were especially prejudicial as "the last thing the jury heard").

Having concluded that the prosecutor's statements were obviously improper, the next question is whether they were curable. In *Chitwood*, the Supreme Court held that "a

---

[1] We note that there is a separate "provocation" limitation on self-defense on which the jury was also instructed. *See* ORS 161.215(1)(a) ("[A] person is not justified in using physical force upon another person if *** [w]ith intent to cause physical injury or death to another person, the person provokes the use of unlawful physical force by that person."); *State v. North*, 333 Or App 187, 190, 552 P3d 152 (2024), *rev den*, 373 Or 305 (2025) ("[T]he asserted provocation must be made with the intention of causing the victim to use physical force so that the defendant could, in turn, respond with physical force and then claim self-defense."). It may be that the prosecutor had that defense limitation in mind when using the word "provoke" intermittently throughout closing. However, in context, it sounds like he is using "provoke" in the general sense, particularly when he refers to "a duty, injecting himself, not to provoke," creating an ambiguity that tended to exacerbate the improper statements about the initial-aggressor limitation.

defendant asserting plain error must demonstrate that the prosecutor's comments were so prejudicial that an instruction to disregard them would not have been sufficiently curative to assure the court, in its consideration of all the circumstances, that the defendant received a fair trial." 370 Or at 312. That is an important limitation on plain-error review of prosecutorial misconduct in closing argument because, "[g]enerally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's misconduct." *State v. Davis*, 345 Or 551, 583, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009). The Supreme Court recently reaffirmed in *Perez* that noncurability is essential to plain error when it comes to prosecutorial misconduct. *See Perez*, 373 Or at 605 (explaining that, under *Chitwood*, for there to be "an error of law"—which is one of the requirements for an error to be "plain"—"the effect of the prosecutor's improper argument must have been to deny the defendant a fair trial, which require[s] a defendant to establish that the trial court's only lawful option—had the defendant objected—would have been to declare a mistrial, because no curative instruction would have been effective").

It is on the issue of curability that defendant's claim of plain error falters. The prosecutor's statements in closing argument were legally incorrect and misleading as to what it means to be an "initial aggressor" for purposes of the limitation on self-defense. The state had the burden to disprove self-defense, but, under *Worsham II*, 373 Or at 741, the state was not obligated to request an instruction on the meaning of "initial aggressor," nor was the trial court required to give such an instruction absent a request. It therefore fell on defendant to request an instruction on the meaning of "initial aggressor," which he failed to do. The prosecutor filled the resulting void as described.

Had defendant objected to the prosecutor's statements in closing argument, we assume that the trial court would have agreed to instruct the jury on the meaning of "initial aggressor" and also instructed the jury to disregard any statements by the prosecutor that were inconsistent with the law as stated in the jury instructions. Those actions would have been sufficient to ensure defendant a fair trial. It would have been better for the jury to have been

instructed on the meaning of "initial aggressor" along with the other instructions, before closing arguments, in part because it might have dissuaded the prosecutor from ever making the statements at issue.[2] However, even after hearing those statements, the jury could be expected to follow the law on what it means to be an initial aggressor had it been properly instructed. The prosecutor's statements were not of the sort so prejudicial as to require a mistrial because there would be no practical way to unring the bell. *See Chitwood*, 370 Or at 311 (recognizing that some statements are so prejudicial that, "as a practical matter, the bell once rung, cannot be unrung" (internal quotation marks omitted)). A clear instruction on the applicable law and an appropriate instruction to disregard any contrary statements made in closing argument would have ensured a fair trial.

Our conclusion that the prosecutor's statements in closing argument were obviously improper but were curable means that defendant's second assignment of error necessarily fails. *Perez*, 373 Or at 606 (reiterating that a prosecutor's statements must be both obviously improper *and* incurable to constitute plain error). Any possible relief for defendant lies in post-conviction, not plain-error review on direct appeal. *See State v. Durant*, 327 Or App 363, 365, 535 P3d 808 (2023), *rev den*, 374 Or 143 (2025) (observing that, although "prosecutorial statements that were improper but curable are not an appropriate subject of plain-error review" on direct appeal, "the failure to move to strike or for a curative instruction might still be a basis for post-conviction relief" (emphasis omitted)).

Affirmed.

---

[2] Prosecutorial misconduct does not require bad faith, and we express no opinion on whether the prosecutor in this case realized that his statements would mislead the jury as to the initial-aggressor limitation on self-defense. *See State v. Grenawalt*, 86 Or App 96, 98, 738 P2d 232, *rev den*, 304 Or 405 (1987) ("The fact that a prosecutor's conduct is not intentional does not affect a defendant's fundamental right to a fair trial."); *see also State v. Brunnemer*, 287 Or App 182, 187-88, 401 P3d 1226 (2017) ("Our case law defines prosecutorial misconduct as any activity by the prosecutor which tends to divert the jury from making its determination of guilt or innocence by weighing the legally admitted evidence in the manner prescribed by law." (Internal quotation marks omitted.)). As a practical matter, regardless of the prosecutor's subjective intentions, a correct jury instruction on the meaning of "initial aggressor," given before closing arguments, likely would have resulted in the prosecutor arguing that issue differently in closing.